**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HAY GROUP, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant | ) | |
| | ) | |
| v. | ) | Case No. 02 C 8194 |
| | ) | |
| E. WEBB BASSICK IV; ANNA-MARIA B. | ) | Judge Joan B. Gottschall |
| TAPLING; and COMPENSATION | ) | |
| STRATEGIES, INC. | ) | |
| | ) | |
| Defendants/Counterclaimants | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAY GROUP, INC. DEFERRED | ) | |
| COMPENSATION PLAN; and HAY | ) | |
| GROUP, INC. DEFERRED COMPENSATION | ) | |
| AND SUPPLEMENTAL PENSION PLAN | ) | |
| | ) | |
| Co-Counterdefendants | ) | |
| ----------------------------------------------------------------- | ) | |

## MEMORANDUM OPINION AND ORDER

In this diversity case, plaintiff Hay Group, Inc. ("Hay") has filed an eight-count first

amended complaint against defendants E. Webb Bassick, IV ("Bassick"), Anna Maria B. Tapling

("Tapling") and Compensation Strategies, Inc. ("CSI"). The first amended complaint includes

counts under Illinois law for: (i) misappropriation of trade secrets (against all defendants) (count

I); (ii) breach of covenant not to compete (against Bassick) (count II); (iii) breach of covenant

not to compete (against Tapling) (count III); (iv) tortious interference with contract (against all

defendants ) (count IV); (v) tortious interference with prospective business relationships (against

all defendants) (count V); (vi) breach of duty of loyalty (against Bassick) (count VI); (vii) breach

of duty of loyalty (against Tapling) (count VII); and (viii) civil conspiracy (against all defendants) (count VIII).  Defendants have moved for summary judgment as to each count.

Defendants have filed their own seven-count second amended counterclaims, including Illinois law counts for: (i) breach of Bassick's employment contract (count 1); (ii) violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.* ("Wage Act") (as to Bassick) (count 2); (iii) breach of Tapling's employment contract (count 3); (iv) violation of the Wage Act (as to Tapling) (count 4); (v) ERISA violations as to deferred compensation owed to Tapling (count 5); (vi) ERISA violations related to Bassick's Supplemental Executive Retirement Plan (count 6); and (vii) wrongful denial of benefits to Bassick under ERISA (count 7).  Plaintiff and co-counterdefendants pension plans have filed: (1) a motion for partial summary judgment as to several monetary claims Bassick and Tapling have made, and (2) a separate motion for partial summary judgment as to counts VI and VII of the second amended counterclaims.

For the reasons discussed below, defendants' motion for summary judgment is granted as to counts II, III, IV, and V of the first amended complaint, and denied as to counts I, VI, VII and VIII.  Counterdefendants' motion for partial summary judgment is granted as to Bassick's and Tapling's bonus counterclaims; counts 6 and 7 of the counterclaims (in their entirety); and as to amounts accrued for Tapling in the Hay SERP plan after the amendment became effective in July 2000.  Hay's motion for partial summary judgment is denied as to Hay's car and investment allowance obligations to Bassick; Bassick's and Tapling's severance and Health benefits claims; and Bassick's breach of contract claims with respect to section 4.D. of the Bassick Letter.

**Facts**

The court offers a brief factual overview of the parties and their relationships to each other. For purposes of clarity, additional facts pertinent to a count are discussed where necessary in connection with the court's ruling on that count.

Hay is a large human resources consulting firm operating in at least 35 countries around the world, and has 12 offices in the United States, including one in Chicago. Prior to joining Hay in April, 1996, Bassick had been employed with competing international firms since 1974. Bassick's expertise is in the area of executive compensation consulting, which is apparently a somewhat minor sub-specialty in the world of human resources consulting, and Hay hired Bassick to head its executive compensation consulting practice. Immediately after hiring Bassick, and at Bassick's request, Hay opened a new office in Lincolnshire, Illinois that was devoted to housing the executive compensation consulting practice group headed by Bassick. Bassick's title at Hay was "managing director for the executive compensation practice."

Tapling is also an experienced executive compensation consultant. Tapling worked with Bassick at his prior firm, and Hay hired Tapling at Bassick's behest to work with Bassick in the Lincolnshire office. Neither Bassick nor Tapling were members of Hay's Board of Directors, and were not listed as officers of any of the various entities that compose Hay in a list of all officers and directors tendered to defendants by Hay during discovery. Bassick and Tapling were partners in Hay, in that they were equity holders in the Bermuda company (later transferred to an LLC) that owns Hay. Bassick reported to a Hay official named Vicky Wright, who in turn reported to the President and CEO of Hay; later in Bassick's tenure at Hay, a new President and CEO was appointed to whom Bassick was to report directly, but Bassick never spoke with the new President and CEO. Neither Bassick nor Tapling received any training from Hay; both were

hired to immediately assume significant responsibilities in Hay's executive compensation practice group. Bassick and Tapling both signed covenants not to compete which are discussed more fully below.

Hay has approximately 7,000 clients, of which Bassick and Tapling performed services for 45 during 2001 and 2002. In the autumn of 2001, the parties agree, billings in the executive compensation consulting group began to fall precipitously. Also in the autumn of 2001, without consulting Bassick and/or Tapling, Hay decided to close the Lincolnshire office and move its personnel to Hay's Chicago office. Bassick protested the Lincolnshire office's closing, but Hay continued with its plans over Bassick's protest. Worried that Bassick would leave Hay after the office closing, both Tapling and another consultant in the office, Darrell Karolyi (not a party to this suit), approached Bassick and told him that if he left, they wanted to accompany him.

In the late autumn of 2001, Bassick, Bassick's wife, Tapling, Karolyi and another former Hay employee began the process of setting up the corporate formalities, renting office space and generally preparing for operation of a new executive compensation consulting firm, which eventually became defendant CSI. Tapling and Bassick tendered their resignations to Hay on April 2, 2002, and went to work for CSI on April 3, 2002.

Factual issues pertinent to each count of the first amended complaint and second amended counterclaims are discussed in relation to that count.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**[1]

**Count II - Bassick Covenant Not to Compete**

In count II of the amended complaint, Hay has sued Bassick for breach of a covenant not to compete, based allegedly on Bassick: creating CSI; diverting Hay clients to CSI; soliciting and enticing Tapling and other Hay employees to leave Hay to join CSI; and misappropriating Hay's trade secrets and confidential information. The covenant not to compete at issue is attached to an April 9, 1996 letter from Hay to Bassick setting forth the terms of Bassick's employment with Hay ("Bassick Letter"). The covenant is a separate document ("Bassick Noncompete") that was signed by Bassick at the same time as the Bassick Letter.

Defendants first argue that, as a matter of law, the Bassick Noncompete is unenforceable. It is true that "the question of whether a restrictive covenant is enforceable or not is a question of law." *Lawrence and Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 685 N.E.2d 434, 440 (Ill. App. Ct. 1997) (citing cases). However, a covenant is enforceable if its terms are reasonable and necessary to protect the employer's legitimate business interest, "a determination that necessarily turns on the facts and circumstances of each case." *Id.* at 441 (citing cases). "The reasonableness of a noncompetition agreement is measured by its hardship to the employee, its effect upon the general public, and the reasonableness of the time, territory and activity restrictions." *Abbot-Interfast Corp. v. Harjabus*, 619 N.E.2d 1337, 1341 (Ill. App. Ct.

---

[1] At the outset, the court notes that Bassick has failed to provide a synopsis of relevant facts in his brief requesting summary judgment, needlessly complicating resolution of his motion for summary judgment. Both parties provide the statements of facts required of plaintiffs and defendants by Local Rule 56.1, but these separate required filings are poor substitutes for clearly setting forth and developing the relevant facts in the brief. *See Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) ("56.1 statements do not abrogate a party's obligation to recite its version of facts in its supporting memorandum.").

1993) (citing cases). In addition, "[a] noncompetition agreement which restricts a specific activity, such as soliciting specific clients, is subject to a lower degree of scrutiny than an agreement which prohibits the employee from engaging in any type of competition with the employer." *Id.* at 1341. Unfortunately for Hay, the Bassick Noncompete prohibits Bassick from engaging in any type of competition with Hay for its entire two year term. Because of this, it is clearly unreasonable as a matter of law.

The introductory section of the Bassick Noncompete reads:

> Covenant Not to Compete. During his employment and for two (2) years thereafter, the Executive shall not directly or indirectly, own, manage, operate, control, be employed by or participate in the ownership, management, operation or control of, or be connected in any manner with any business of the type and character engaged in and competitive with that conducted by Employer and the other members of the Affiliated Group.

In addition to this general prohibition, the Bassick Noncompete purports to contain a series of specific activity limitations:

> As used below, "Employer" shall mean the Employer and the other members of the Affiliated Group. Without limiting in any way the generality of the foregoing, the Executive, during such period, specifically shall not, directly or indirectly:
>
> (a) persuade or attempt to persuade any client of the Employer to cease doing business with the Employer, or to reduce the amount of business it does with the Employer;
> . . . .
> (f) engage in any business which is competitive with, in whole or in part, th business of the Employer.

Even a cursory reading of these provisions makes it clear that the effect of the Bassick Noncompete is to prohibit Bassick from engaging in any sort of competition with Hay. The introductory paragraph prohibits Bassick from being "connected in any manner" with "any business of the type and character engaged in" by Hay or its affiliates. The next paragraph

6

clearly says that the listed activity restrictions are not intended to limit "in any way the generality of the foregoing"; in other words, the activity restrictions are a subset of the general prohibition on competition, and are not in lieu of the general prohibition. Finally, if there were any question as to the overarching generality of the prohibition on Bassick's inability to engage in any business in competition with any business activity conducted by Hay, the final "activity restriction" states that Bassick may not "engage in *any* business which is competitive with, *in whole or in part*, the business of the Employer" (emphases added). This noncompete effectively precludes Bassick from engaging in his occupation of providing executive compensation consulting (which both parties agree is an aspect of Hay's business) in any part of the world (because the Bassick Noncompete does not contain a geographic limitation). For this reason, the Bassick Noncompete is an unreasonable restraint on trade and is invalid. *Dryvit System, Inc. v. Rushing,* 477 N.E.2d 35, 37 (Ill. App. Ct. 1985) (noncompetition agreement prohibiting employee from competing in any manner, without geographic limitation, ruled unreasonable); *Lee/O'Keefe Ins. Agency, Inc. v. Ferega*, 516 N.E.2d 1313, 1318-19 (Ill. App. Ct. 1987) (noncompetition agreement effectively prohibiting former employee from practicing his occupation unreasonable as a matter of law); *Lawrence and Allen, Inc.,* 685 N.E.2d at 443 (same).

The Bassick Noncompete contains a severability clause, which Hay contends saves the Bassick Noncompete from being completely unenforceable. The severability clause reads:

> It is the desire and intent of the parties that the provisions of this Covenant Not to Compete shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If any particular provisions or portion of this Covenant Not to Compete shall be adjudicated to be invalid or unenforceable, this Covenant Not to Compete shall be deemed amended to delete therefrom such provision or portion adjudicated to be

7

invalid or unenforceable, such amendment to apply only with respect to the
operation of this paragraph in the particular jurisdiction in which such
adjudication is made.

Specifically, Hay argues that the court should implement this clause to strike any sections

of the Bassick Noncompete that are unenforceable. The court does not accept this argument.

While a court applying Illinois law may "make slight modifications to effectuate the intent of the

parties . . . the *degree* of unreasonableness of the original restraint" is a significant factor in

guiding the court's modification. *Eichmann v. Nat'l Hospital and Health Care Servs., Inc.*, 719

N.E.2d 1141, 1149 (Ill. App. Ct. 1999). Where, as here, the restraint is patently "unfair because

of its overbreadth," courts will refuse to modify the agreement, even in the presence of a

severability clause. *Id.* The court finds that the Bassick Noncompete is sufficiently overbroad

that any modifications would amount to the court rewriting the agreement. *Dryvit System*, 477

N.E.2d at 39 (refusing to modify covenant not to compete because of its "very broad geographic

scope which is clearly unreasonable"); *Eichmann*, 719 N.E.2d at 1149 (refusing to modify

unreasonable restrictive covenant despite presence of clause requesting judicial modification)

(citing *House of Vision, Inc. v. Hiyane*, 225 N.E.2d 21 (1967)); *Lawrence & Allen, Inc.*, 685

N.E.2d 434 (Ill. App. Ct. 1997); *Lee/O'Keefe Insurance Agency*, 516 N.E.2d 1313 (Ill. App. Ct.

1987). The Bassick Noncompete is unenforceable in its entirety, and Bassick's motion for

summary judgment is granted as to count II of the first amended complaint.

### Count III - Tapling Covenant Not to Compete

In count III, Hay claims that Tapling breached her separate contractual obligation not to

compete ("Tapling Noncompete") with Hay subsequent to her employment. Tapling's alleged

breaches include her employment as CSI's vice president, her solicitation of Hay clients, her

soliciting Hay employees to leave Hay for CSI, her misappropriation and use of Hay's trade secrets (through her unauthorized use of Hay's confidential information). Unlike Bassick's essentially limitless agreement, the Tapling Noncompete is considerably more restricted, and focuses on two activity restrictions. It reads in full:

> Non-Competition. In any circumstances, you recognize that you will need to remain available and cooperate with Hay Group, Inc. to effect an orderly transition of your client responsibilities so that all of Hay Group, Inc.'s clients will be retained by Hay Group, Inc. You also agree for a period of one (1) year after the termination by either party of your employment with the Hay Group, Inc. for any reason whatsoever to refrain from: (i) soliciting or otherwise directly or indirectly attempting to induce any employee of Hay Group, Inc. or its affiliates to terminate his or her employment; and (ii) soliciting or doing business directly or indirectly with any person or entity that was a client of Hay Group, Inc. or its affiliates on the date of your termination of employment with Hay Group, Inc. "Client," for purposes of this paragraph, means any person or entity that has retained the services of Hay Group, Inc. or its affiliates at any time during the two (2) year period immediately prior to the date of your termination of employment.

Of course, the test for enforceability of the Tapling Noncompete is the same as for the Bassick Noncompete. Accordingly, to win on summary judgment, Tapling needs to show that the Tapling Noncompete is not reasonably necessary for the protection of the employer's business from unfair or improper competition. *Lawrence and Allen, Inc.,* 685 N.E.2d at 440. In order to enforce the Tapling Noncompete, Hay must also have an interest subject to protection, a requirement the court did not discuss with respect to the Bassick Noncompete because it was patently unreasonable. *Arpac Corp. v. Murray*, 589 N.E.2d 640, 648 (Ill. App. Ct. 1992). Tapling argues that Hay has no protectable business interest in its clients, and thus no legitimate interest subject to protection by enforcement of the Tapling Noncompete.

Ordinarily, an employer does not have proprietary interest in its clients sufficient to constitute an interest protectable by enforcement of a noncompetition agreement. *Corroon &*

*Black, Inc. v. Magner*, 494 N.E.2d 785, 792 (Ill. App. Ct. 1986).  Nevertheless, Illinois courts have held that there are two general situations where a court could find such an interest to exist for purposes of enforcing a covenant not to compete: "(1) the employer has a 'near permanent' relationship with its customers and but for the employment, the employee would not have had contact with the customers, or (2) the employee obtained trade secrets or other confidential information while in plaintiff's employ, and subsequently attempted to use it for his or her own benefit."[2]  *Lyle R. Jaeger Agency, Inc. v. Steward*, 325 N.E.2d 397, 400 (Ill. App. Ct. 1993).  Hay argues that the nature of the executive compensation consulting business (which focuses on providing professional services) indicates that Hay has a near-permanent relationship with its clients.  *Springfield Rare Coin Galleries, Inc. v. Mileham*, 620 N.E.2d 479, 488 (Ill. App. Ct. 1993) ("A near-permanent relationship with clients is inherent in the provision of professional services.")

Hay has also produced evidence that it has a strong brand-name and strong customer loyalty.  In addition, it is clear from the record that Hay paid Tapling (and Bassick) significant amounts specifically to assist it in acquiring and serving clients, for the benefit of Hay, indicating the difficulty (and worth) of developing and maintaining a client base.  All of these factors indicate that Hay has a near-permanent relationship with its clients for purposes of establishing a proprietary interest enforceable in a covenant not to compete.  *See also Trailer Leasing Co. v. Associates Commercial Corp.*, No. 96 C 2305, 1996 WL 392135, at *2 n.2 (N.D.

---

[2]  The court notes that Hay provides only cursory argument (at least in the context of its attempt to enforce the Tapling Noncompete) that Bassick and Tapling obtained confidential information and attempted to use it, and has provided no satisfactory evidence of this.  Thus, Hay has effectively waived argument on the second prong, and the court limits its detailed discussion to the parties' arguments under the first prong.

Ill. July 10, 1996) (noting use of "nature of business" test to determine near-permanency of client relationships).

While Hay has shown some indicia of a near-permanent relationship with its clients, it has not shown that "but for" her employment there, Tapling would not have come into contact with the clients with whom Hay alleges she has breached the Tapling Noncompete by serving at CSI. For Hay to have a protectable interest, Tapling must also be shown to have gained contact with the clients she works with at CSI because of her affiliation with Hay: "but for the employment, the employee would not have had contact with the customers." *Lyle R. Jaeger Agency,* 325 N.E.2d at 400. Defendants' L.R. 56.1 statement and Hay's response to it reveal that of the 11 clients (13 according to Hay) CSI has served that were also served by defendants during their tenure at Hay, at least 8 of them are undisputed to have been in contact with Tapling, and/or other CSI employees, independently rather than to have been introduced to Tapling by Hay. At least one additional shared client started using Hay's services after Tapling and Bassick left to work for CSI. As to the other shared clients, Bassick and/or Tapling have produced affidavit and/or deposition testimony evidencing that they had contact with these clients or client representatives prior to their association with Hay. Hay has not rebutted this evidence. Thus, Hay has failed to provide sufficient evidence that it has a protectable interest in the clients at issue to survive summary judgment.

Even if Hay had a protectable interest in the clients at issue, the Tapling Noncompete would also fail because it is unreasonable. Hay points out that restrictive covenants that restrict only specific activities are scrutinized less closely than those containing general restrictions on an employee's ability to work in his chosen field. *Abbot-Interfast Corp.*, 619 N.E.2d at 1341

(citing cases).  It is also true, however, that a noncompetition agreement "which prohibits an employee from soliciting any of the employer's clients is less likely to be upheld as a reasonable restraint on trade than a noncompetition agreement which prohibits an employee only from soliciting clients with which the employee has had contact while he or she was employed with the employer." *Id.* at 1342 (citing cases).  In addition, a prohibition on solicitation alone is more likely to be upheld than one prohibiting a former employee from doing any business at all (even at the client's behest) with the employer's clients, as that prohibition would restrict the rights of the client without its consent.  *Id.*  Section (ii) of the Tapling Noncompete includes a restriction on solicitation and also an unqualified restriction on "doing business directly or indirectly" with any Hay client, and contains no geographic limitation.  It is undisputed that Hay has over 7,000 clients, and a worldwide business.  Tapling points out that she and Bassick provided services to only 45 of these clients during the year preceding her departure for CSI.[3]  Under these facts, it is unreasonable for Hay to preclude Tapling from serving Hay's 6,955 clients with whom she has had no contact during the applicable period.  *McRand, Inc. v. Van Beelen*, 486 N.E.2d 1306, 1315 (Ill. App. Ct. 1985) (covenant not to compete unreasonably overbroad where it encompasses entire customer base of employer instead of subset of customers actually served by former employee).  Hay requests the court to "blue-pencil" the Tapling Noncompete in an attempt to render it enforceable.  The court declines to do so, both because to do so would require substantial revision, and would eliminate any incentive for employers to compose their restrictive covenants in compliance with the law.  *Trailer Leasing Co.*, 1996 WL 392135, at *4

_____

[3]  The Tapling Noncompete contains a durational limitation of one year, which itself is reasonable, but this does not overcome the overbroad activity restraints and lack of geographical limits in the Tapling Noncompete.

(citing *Telxon Corp. v. Hoffman*, 720 F. Supp. 657 (N.D. Ill. 1989)).

In addition, section (i) of the Tapling Noncompete is a nonsolicitation of employees agreement, purporting to prevent Tapling from "soliciting or otherwise directly or indirectly attempting to induce any employee of Hay Group, Inc. or its affiliates to terminate his or her employment." The parties spend little effort discussing the enforceability of this provision. The court notes, however, that section (i) is extremely broad, prohibiting the solicitation of "any" employees of Hay or its worldwide affiliates (including, presumably, Hay's janitorial staff), without any connection being shown between such a broad restriction and a legitimate business interest of Hay. As with any restrictive covenant, under Illinois law employee nonsolicitation agreements are scrutinized carefully and must be narrowly tailored. *Pactiv Corp. v. Menasha Corp.*, 261 F. Supp. 2d 1009, 1014-17 (N.D. Ill. 2003). This restriction is a blanket prohibition on soliciting any Hay employee, and as such is unenforceable. *Id.* (blanket ban on soliciting management-level employees of large company with locations in 20 countries unenforceable under Illinois law; refusing to blue-pencil agreement). The court grants defendants' motion for summary judgment on count III.

**Count I - Trade Secrets**

Count I of the first amended complaint claims that Bassick and Tapling knowingly violated their employment agreements by using Hay's confidential information at CSI in violation of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq.* Hay has stipulated that the only alleged trade secrets at issue are the "LTI valuation model and/or LTI valuation processes" (together, "LTI Information"). In general, an LTI valuation model (or process) is a set of one or more methodologies and processes for valuing long-term incentive

vehicles, such as stock options, restricted stock, and performance shares. The LTI Information seems to be one or more LTI valuation models that were produced at Hay (with the participation of several Hay employees and at least one outside contractor) at least partially under Bassick's direction. Karolyi created CSI's valuation model after leaving Hay group.

The ITSA protects information as trade secrets that: "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." Illinois courts have settled on the following factors to analyze whether allegedly protected information is actually a trade secret:

> (1) The extent to which the information is known outside of [the plaintiff's] business; (2) the extent to which it is known by the employees and others involved in [the plaintiff's] business; (3) the extent of measures taken by [the plaintiff] to guard the secrecy of the information; (4) the value of the information to [the plaintiff] and to [the plaintiff's] competitors; (5) the amount of effort or money expended by [the plaintiff] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Strata Mktg. v. Murphy*, 740 N.E.2d 1166, 1176 (Ill. App. Ct. 2000) (quoting *ILG Industries, Inc. v. Scott*, 49 Ill. 2d 88, 93 (1971)). The parties assume (without discussion) that the LTI Information is sufficiently valuable to satisfy the fourth prong. Defendants do, however, offer several arguments that the LTI information is not actually secret.

Bassick and Tapling first argue that the conceptual framework of the LTI Information (called the "Black-Scholes calculation methodology" or "Black-Scholes model") is freely available on the internet to anyone who wishes to use it. They allege, however, that they never had access to "the mathematics and programming of the model [LTI Information]." In addition,

Bassick and Tapling contend that the "inputs, variables, weightings, and assumptions of the Hay Group models and processes [LTI Information]" are not actually secret.

Despite these arguments, Bassick and Tapling have not carried their burden to show that the LTI Information is not secret. Assuming *arguendo* that some or all of the component information used to construct the LTI information is available publicly, Hay could still prove that its organization and implementation of this information is unique, proprietary and secret, sufficient to succeed on a claim under the ITSA. *See Hexacomb Corp. v. GTW Enters., Inc.*, 875 F. Supp. 457, 463 (N.D. Ill. 1993) (Illinois trade secret may exist where there is "a combination of characteristics and components which affords a competitive advantage.")

In another attempt to prove that the LTI Information is not actually secret, Bassick and Tapling claim that Hay did not attempt to keep it secret. *See Pope v. Alberto-Culver Co.*, 694 N.E.2d 615 (Ill. App. Ct. 1998) ("[W]hether the information sought to be protected qualifies as a trade secret focuses fundamentally on the secrecy of such information."). In support of this argument, Bassick and Tapling point out that Hay shared certain aspects of its valuation processes and other pertinent information with clients and other non-Hay parties. This argument is unavailing. Defendants assert only that Hay shared publicly-available information that may or may not compose the protectable LTI Information. Defendants have not brought forth sufficient evidence to show that Hay's unique arrangement of public information or other potentially secret LTI Information was shared with outside parties.

With respect to prongs 5 and 6 of the test set forth in *Strata Mktg.*, the amount of effort and expense put forth by Hay in constructing the LTI Information is also a question of fact. The parties disagree as to the actual expense, with defendants estimating a total cost of $6,000-

$8,000, and Hay estimating $16,000 in cash outlay, plus the time cost to Hay of Bassick and other Hay employees who worked to construct the LTI Information. The amount and its relevance to the LTI Information's trade secret status (is $6,000 a significant amount for Hay to spend on developing information? Is $16,000 plus employee time?) is unclear from the facts presented and is a question of fact best left for the jury.

Bassick and Tapling also argue that they did not misappropriate the LTI Information. This argument, if successful, would also be sufficient to entitle them to summary judgment on count I. Unfortunately, in the context of defendants' misappropriation argument, the undeveloped nature of the facts presented becomes clear. Neither party has defined the LTI Information adequately to enable the court to rule on whether it has been misappropriated - the parties speak in generalities that the LTI Information consists of a Black-Scholes model that uses unspecified "inputs" and/or "underlying equations." There are also scattered allegations by the parties that the LTI Information makes use of such factors as "vesting schedules," "actuarially-derived probabilities," and other information, but these allegations are presented without sufficient context as to their significance in differentiating the LTI Information from other executive compensation valuation tools. Thus, what exactly composes the supposedly misappropriated information is an unsettled question of fact, as is whether the specific information used by defendants and other CSI personnel in constructing their modeling tools was misappropriated from Hay. Other questions of fact are implied, concerning whether any protectable information was taken from Hay by improper means or under circumstances in which the acquiring person knew or should have known that there was a duty to keep such information within Hay. Defendants' motion for summary judgment is denied as to count I.

**Counts VI and VII - Fiduciary Duty and Duty of Loyalty as to Bassick and Tapling**

Hay argues that Bassick and Tapling were corporate officers of Hay and thus owe a fiduciary duty of loyalty not to: "(1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed." *Veco Corp. v. Babcock*, 611 N.E.2d 1054, 1061 (Ill. App. Ct. 1993). To support its argument that Bassick and Tapling owed both fiduciary duties and duties of loyalty to Hay, Hay points out that Bassick was the managing director of Hay's executive compensation practice, and that both Bassick and Tapling were Vice Presidents of Hay and equity holders in the LLC that owns Hay. In addition, Bassick had supervisory responsibility for the Lincolnshire, Illinois office and oversight over as many as thirty employees. These facts suggest that Bassick, and to a lesser degree Tapling, could be officers, but they are not determinative. As other courts in this district have noted, "Illinois law involving fiduciary duties of corporate officers following their departure from a corporation is, at best, confusing," and this includes the definition of who is an "officer" for purposes of ascribing fiduciary responsibility. *Superior Environmental Corp. v. Mangan*, 247 F. Supp. 2d 1001, 1002 (N.D. Ill. 2003) (noting that "Illinois courts vary greatly . . . in determining who owes a fiduciary duty and in defining the scope of this duty.")

A pivotal question that is unanswered with respect to defendants is how much of Bassick's and Tapling's work at Hay was guided by Hay, and how significant Bassick's and Tapling's managerial responsibilities (with respect both to client contacts and employee management) were in the context of Hay's organizational structure, *i.e.*, Bassick may have controlled the work of some employees, but it is unclear that this responsibility was significant

enough to make him an "officer" of a 7,000 employee company like Hay, so as to ascribe fiduciary responsibilities to him. *Id.* (noting that defendant "was in charge of [branch office's] day-to-day management," but "[h]ow much guidance he followed from the corporation is unclear.") Nevertheless, Hay has succeeded in raising factual questions as to whether Tapling and Bassick were officers, and thus whether they owed fiduciary duties to Hay.

With this question unresolved, Hay has also raised a sufficient factual controversy to preclude a grant of summary judgment as to its allegations of breach of fiduciary duties and the duty of loyalty for Tapling and Bassick. For example, Hay has produced some evidence suggesting that Tapling and Bassick may have solicited Hay clients and employees for CSI while employed at Hay, and/or that they may have improperly used Hay confidential information in setting up CSI. *See Superior Environmental Corp.*, 247 F. Supp. 2d at 1003 ("[A] plaintiff may prove a breach of fiduciary duty by showing that a defendant used information gained during employment with defendant for his own use, even if this information does not rise to the level of trade secret protection.") The court does not mean to imply that this evidence is conclusive, but rather that Hay has succeeded in raising sufficient factual questions to survive summary judgment. Bassick and Tapling's motion for summary judgment on counts VI and VII is denied.

**Counts IV and V - Tortious Interference With Contract and Business Relations**

As to count IV, the parties' arguments are not entirely clear, but it appears that Hay confines its argument for tortious interference with contractual relations to its claim that Bassick induced Tapling to leave Hay in breach of the Tapling Noncompete. As the court has held, the Tapling Noncompete is unenforceable, robbing Hay of any valid express contract on which to base its tortious interference with contract claim. *Strosberg v. Brauvin Realty Servs., Inc.*, 691

N.E.2d 834, 845 (Ill. App. Ct. 1998) (first element of Illinois tort of intentional interference with contract is "the existence of a valid, enforceable contract between the plaintiff and a third party."). To the extent that count IV is based on the theory that Bassick and CSI tortiously interfered with Tapling's employment contract, defendants' motion for summary judgment is granted.

Nevertheless, as Hay argues in the alternative, where there is "an action for tortious interference with a contract terminable at will," such as Tapling's at-will employment relationship (which is assumed by the parties), courts will construe the claim "as one for intentional interference with prospective economic advantage."[4] *Canel & Hale, Ltd. v. Tobin*, 710 N.E.2d 861, 872 (Ill. App. Ct. 1999) (citing cases); *Pena v. Novartis Pharms. Corp.*, No. 04 C 3790, 2004 U.S. Dist. LEXIS 20847, at *6 (N.D. Ill. Oct. 13, 2004) ("This court has previously held that inducement of the termination of an at-will employment contract constitutes, at most, interference with a prospective economic advantage, not interference with contractual relations.") To establish a claim for interference with a prospective economic advantage under Illinois law, a plaintiff must show: "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991). Defendants point

---

[4] Hay refers to this tort in its briefs as "tortious interference with business relations," but the main case cited by Hay and other cases reviewed by the court refer to the tort claimed by Hay as "interference with prospective economic advantage." *Otterbacher v. Northwestern Univ.*, 838 F. Supp. 1256, 1260 (N.D. Ill. 1993).

out that all of the employees hired by CSI (Tapling, and four others who are not parties to this

action) with whom Hay claims it had a reasonable expectation of continued employment were at-

will employees, and Hay has not brought forth any facts to support its claim that it had a

reasonable expectation that these employees either were not at-will or that they would serve for

any certain period of time.  Hay has also not pointed to any facts indicating "purposeful

interference" by Bassick with Hay's relationships with its employees.  Thus, Hay has not

brought forth any evidence that would allow it to prevail in its count IV claims relating to

defendants' hiring of former Hay employees.  *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005)

(granting motion to dismiss where plaintiff "did not plead that he had a reasonable expectation

that his [employment] relationships with either [of two employers] would continue longer than

they did . . . and nothing in the pleadings suggests that business relationships of longer duration

could reasonably have been expected.")  Summary judgment is granted as to count IV in its

entirety.[5]

In count V, Hay alleges that Bassick and Tapling interfered with Hay's business relations

with nine of its clients.  As discussed earlier in relation to the parties' arguments on the Tapling

Noncompete, Hay has failed to show that it was responsible for the initial contact with any of the

clients at issue, or that it has any proprietary claim as to these clients.  In addition, during its

cursory argument in support of count V, Hay simply asserts (without evidence) that while they

_____

[5]  The court notes that, in addition to claims relating to Bassick's and CSI's alleged inducement of Hay employees to leave Hay, count IV includes allegations that Bassick and CSI sought to interfere with Hay's business relations with Tapling and other employees by inducing them to "steal Hay group's confidential information, and steal Hay Group's customers." (Compl. ¶¶98, 101.)  Hay has not offered evidence in support of these contentions, and, in fact, has also not offered any argument in support of them.  Hay makes similar claims in count V.

were still employed by Hay, Bassick and Tapling "contacted" the clients about taking their business to CSI. To defeat a motion for summary judgment, Hay must produce some evidence that would support its claims at trial, such as evidence supporting the inference that Hay could reasonably have expected to continue its relationships with these clients, and that Bassick and/or Tapling purposefully interfered to prevent that relationship from continuing. *Fellhauer,* 568 N.E.2d at 878. Defendants' motion for summary judgment is granted as to count V.

**Count VIII - Civil Conspiracy**

In count VIII, Hay alleges that the defendants' scheme to commit the other torts they allegedly committed, as well as their conduct, with others, in setting up CSI amounts to civil conspiracy. "Civil conspiracy is an intentional tort and requires proof that two or more persons knowingly and voluntarily participate in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Lenahan v. Univ. of Chi.*, 808 N.E.2d 1078, 1087 (Ill. App. Ct. 2004). Despite defendants' success as to several of Hay's claims, Hay's claims alleging misappropriation of trade secrets and breaches of fiduciary duties and duties of loyalty have survived, all of which relate to the creation of CSI. The evidence presented in support of these claims could reasonably support an inference that Bassick and Tapling acted in concert. Defendants' motion for summary judgment on count VIII is denied.

## COUNTERCLAIMS

Hay (as counterdefendant) has filed a motion for partial summary judgment on counterclaimants' second amended counterclaims. Hay has directed its arguments to several of counterclaimants' legal theories, as opposed to the counterclaims' numbered counts. The court has attempted to relate these arguments to the counterclaims' numbered counts, since summary

judgment should generally be granted or denied as to claims, not as to theories.  In the case of

Hay's supplement to its motion for partial summary judgment, filed after the court's April 18,

2005 denial of Hay's motion to dismiss, Hay directed its arguments specifically to counts 6 and 7

of the second amended counterclaims.

**Bassick and Tapling Bonus Claims**

Both Bassick and Tapling claim in count 1 of the second amended counterclaims that

Hay owes them bonus payments for the time they were working at Hay.  Bassick's and Tapling's

claims appear to be based on paragraph 2 of their employment letters.

Section 2 of Bassick's employment letter reads:

> You have an annual incentive opportunity equal to $275,000.  For Fiscal Year '96 and assuming a start date of May 1, 1996, your pro-rated incentive opportunity is equal to $114,583.  Also, Hay agrees to reimburse you the difference between your current incentive opportunity of $108,208 and what your employer pays, up to a maximum of $75,000.  Your pro-rated incentive, plus the additional reimbursement, is guaranteed for the first fiscal year and is payable in December, 1996.  This payment will be in a lump sum and you must be an employee of Hay Group, Inc. at the time the incentive award is made.  In addition to your guaranteed pro-rated incentive for Fiscal Year 1996, you are eligible for a discretionary bonus (in an amount up to $50,000) which can be paid after the first year of employment only, based solely on my judgment about your business results and over-all contribution to the Company.
>
> For Fiscal Year 1997, your annual incentive opportunity of $275,000 is guaranteed.
>
> Each Fiscal Year (beginning October 1), you and I will agree on an Annual Performance Plan with defined objectives and potential incentive payouts based on your responsibilities as Managing Director, Executive Compensation Practice.  Your total annual incentive target will be equal to 73% of your base salary for all future years; and the range around your incentive target will vary from 50% to 100% of your base salary.

The operative language in the Tapling Letter as to bonuses after her first year of employment

with Hay is the same, except that the percentages set for targets and payouts is different: her

"total annual incentive target" is 60%, and "the range around [Tapling's] incentive target will

vary from 30% to 100% of [Tapling's] base salary."

Counterclaimants argue that Bassick and Tapling were owed certain bonus amounts

under these clauses, which amounts were either never paid at all, or were paid deficiently for the

fiscal years 2000, 2001 and 2002 (a partial year for which both Bassick and Tapling claim a *pro*

*rata* bonus). As its primary argument against this assertion, Hay cites *Joy v. Hay Group, Inc.*, 02

C 4989, 2004 U.S. Dist. LEXIS 5418 (N.D. Ill. March 30, 2004) (Guzman, J.), a case filed

against Hay by Lynn Joy, another former Hay employee who worked with Bassick and Tapling

(Joy does not appear to have ever worked at CSI). In *Joy*, Joy had signed an employment letter

containing language substantially identical to that at issue here (with the same percentage

payouts as are allegedly owed to Tapling). Joy argued that she had been paid a deficient bonus

for fiscal year 2001, and that she was unallowably paid no bonus at all when she was owed a *pro*

*rata* share of her bonus for the six months she worked in fiscal year 2002. Like Bassick and

Tapling, Joy left Hay in April, 2002, was paid no bonus for fiscal 2002, and claimed under her

employment letter that she was owed a bonus.

Faced, then, with closely analogous facts and substantially identical contractual language,

the court in *Joy* ruled, after substantial discussion of the operative language, that the description

of the bonuses in question as "potential," along with the description of the 30%-100% bonus

range as a "target," meant, essentially, that the payment of any bonus at all was at Hay's

discretion. *Joy*, 2004 U.S. Dist. LEXIS 5418, at *32 ("Because the plain language of the Offer

Letter is unambiguous and provides a clear and resounding 'no' answer to the disputed issue

whether Joy is entitled to 30% of her base salary, or any pro rata share thereof, the Court's

23

inquiry is over.")  This reasoning was subsequently upheld by the Seventh Circuit.  *Joy v. Hay Group, Inc.*, 403 F.3d 875, 878 (7th Cir. 2005) (reversing other parts of the district court's *Joy* opinion, but noting, "[w]e agree with the district judge, and for the reasons he gave (to which we have nothing to add), that her further claim – to a bonus – has no merit.")  Because this court agrees, the court grants Hay's motion for summary judgment on all bonus-related counterclaims made by Bassick and Tapling.

**Bassick Investment and Car Allowances**

Hay and Bassick briefly argue about whether Bassick is owed his share of investment allowances and car allowance guaranteed by the Bassick Letter.  With respect to both allowances, the Bassick Letter states that they are to be paid "monthly", with the investment allowance due to stop "the month you leave the Company."  Of course, Hay argues that the "monthly" language means that Bassick is owed no benefits for April (in which he worked one day, leaving Hay on April 2, 2002), and Bassick argues that the payments were due in full on the first day of the month.  Neither party has presented evidence beyond the Bassick Letter itself, and the language is ambiguous, precluding a grant of summary judgment.  Hay's motion for summary judgment is denied with respect to its arguments concerning Hay's alleged car allowance and investment allowance obligations to Bassick.

**Bassick and Tapling Severance and Health Benefits**

Both Bassick and Tapling claim that their respective employment letters entitle them to at least one year of their base salaries as severance pay, plus one year of continued health benefits provided by Hay.  The language at issue in each letter states that these benefits are to be paid

"[i]f Hay Group decided to end your employment for reasons other than cause."[6]  Bassick claims that his severance and health benefits owed by Hay amount to approximately $438,500, and Tapling claims that hers amount to approximately $236,000.  Hay argues that it should be granted summary judgment on these claims because it did not "decide to end" Bassick's or Tapling's employment.

Bassick and Tapling assert that under the plain language of the applicable clauses, Hay does not need actually to have terminated Bassick's and/or Tapling's employment for them to be due severance and health benefits; evidence of a Hay decision to end their employment would suffice to trigger the payment obligations, despite the fact that Bassick and Tapling resigned rather than waiting for termination.  The court accepts this argument.  Hay is a sophisticated party represented by counsel, and if it meant to make payment of these benefits contingent on actual termination, it could easily have made its intention clear.  Evidence of a "decision" by Hay to terminate Bassick and/or Tapling would suffice to sustain counterclaimants' claims for severance and health benefits.

Bassick and Tapling point to several facts that, in sum, could allow a reasonable jury to find that Hay decided to end their employment.  For example, near the end of Bassick's tenure at Hay, Hay appointed a new President and CEO (Bernd Schneider) to whom Bassick was supposed to report.  Mr. Schneider took over his new role on October 1, 2001, but he never

---

[6]  In addition, the Bassick Letter includes a handwritten interlineation (initialed by Bassick and Terry Lynch, the signatory for Hay) that inserts an additional condition under which Bassick would be entitled to severance and continued health benefits (interlineation in italics): "If Hay Group decided to end your employment for reasons other than cause *or unless Hay has materially altered the terms and conditions of this offer letter,* the severance package will equal one year of base salary plus health benefit continuation."

spoke directly with Bassick (or Tapling) up to Bassick's departure in April, 2002. Second, in the summer of 2001, several Hay officials held at least one meeting at which they decided to close the Lincolnshire, Illinois office (which housed Bassick's group) and relocate it to downtown Chicago, which increased Lincolnshire-based employees' commuting time significantly. This decision was made without any consultation with Bassick and/or Tapling, and Bassick claims that the Bassick Letter was orally modified around the time of its signing to include a commitment by Hay to house Bassick's group in a north-suburban office. Hay contests this, but it remains an issue of fact. Third, Bassick presents email and deposition evidence reflecting Mr. Schneider's interest in reducing the size of Bassick's group, along with emails evidencing that Hay had performed calculations of severance obligations owed to Bassick in the event that he was terminated for cause. Fourth, Bassick presents evidence of at least one meeting between a Hay official and several of Bassick's and Tapling's subordinates where the Hay official told the employees to seek other consultants in the executive compensation group besides Bassick and Tapling for executive compensation advice. While not conclusive of a Hay decision to end Bassick's and/or Tapling's employment, this evidence (along with other evidence brought forth by counterclaimants), is sufficient to sustain counterclaimants' claims for severance and post-employment health benefits. Hay's motion for partial summary judgment as to these claims is denied.

**Bassick's Claims to Additional Amounts Under Section 4.D. of the Bassick Letter**

Section 4.D. of the Bassick Letter accords Bassick certain benefits intended to replace benefits due to Bassick under the operating agreement of his former employer, Hewitt Associates. Hay makes several arguments regarding the methods by which the amounts due to

26

Bassick under section 4.D. of the Bassick Letter should be calculated. Bassick has strenuously contested each of these arguments. The parties' arguments require interpretation of manner in which the Bassick Letter incorporates, and in some cases modifies, the Hewitt Holdings L.L.C. Operating Agreement, as amended and restated October 1, 1994.

After expending considerable effort and time attempting to follow these arguments, the court is unable to do so. Both parties' arguments frequently require the court to make logical leaps without explanation and appear to incorporate many unstated and unexplained, but essential, assumptions. For these reasons, Hay's motion for partial summary judgment as to amounts claimed by Bassick (or the calculation methods to be used to determine such amounts) under section 4.D. of the Bassick Letter is denied.

**Count 6**

In count 6 of his second amended counterclaim, Bassick claims that he is owed at least $200,000 under various deferred compensation and supplemental pension plans. The parties agree that Hay adopted the Hay Group, Inc. Deferred Compensation and Supplemental Pension Plan, effective as of January 1, 1994. Effective July 1, 2000, Hay revised and renamed the 1994 plan the Hay Group, Inc. Deferred Compensation Plan (collectively, the 1994 plan and the 2000 plan are referred to as the "SERP"[7]). Importantly, the claims review procedures of the 1994 plan and the 2000 plan are substantively identical, and can be found in section 4.6 of either plan. The SERP is a "top hat" plan which allows supplemental deferred compensation benefits to highly-

---

[7] Hay has incidentally argued that both of the 1994 plan and the 2000 plan must be dismissed as parties to this case. The ERISA statute, however, allows a plaintiff to sue a benefit plan. 29 U.S.C. § 1132(d)(1) ("An employee benefit plan may sue or be sued under this subchapter as an entity."). Hay has offered no compelling argument or authority to support its position. Therefore, the court finds that it need not dismiss either plan as a party.

compensated employees of Hay. It is not entirely clear from the parties' filings, but it appears that Hay, and not the employees covered by the SERP, made all contributions to the SERP for the covered employees.

Bassick's claim is complicated. He agrees that when he started work at Hay, he was covered under the 1994 SERP. At some point (likely during 1997), Bassick contends that a separate SERP was founded by Hay, for him individually, to contain amounts due to Bassick that exceeded the limitations on Hay contributions under the 1994 SERP. Bassick says that, despite his repeated requests, he has never been provided with a written copy of the Bassick SERP. Nevertheless, Bassick asserts that the existence of a separate trust set up by Hay to contain only contributions to the Bassick SERP, the fact that the Bassick SERP was not administered by the same plan administrator as the conventional Hay SERP, that it was invested separately from the conventional Hay SERP, along with other facts, indicate that the Bassick SERP exists separately from the conventional Hay SERP.

In addition to these characteristics, Bassick asserts that the Bassick SERP is a modified version of the conventional Hay SERP, and admits that he "never asked Hay Group to alter any of the claims review and appeals procedures applicable to his SERP, and Hay Group never agreed to do so." This odd formulation is suggestive of (but not obviously determinative of) an admission that the Bassick SERP's claims review procedures are the same as those found in the 1994/2000 SERP. In addition, Bassick implicitly acknowledged the applicability of these claims procedures when on August 29, 2003, Bassick's counsel sent a letter to the Hay plan administrator requesting payment under the "Hay Group, Inc. Deferred Compensation Plan" (the full title of the 2000 SERP). Hay's general counsel responded by letter on September 5, 2003

that the plan administrator had begun an investigation of Bassick's claim. Bassick filed a counterclaim for payment of SERP benefits on October 24, 2003, before the expiration of Hay Group's 90-day period in which to make a determination on Bassick's claim under 29 C.F.R. § 2560.503-1(f).[8] As a result, Hay has argued that summary judgment should be granted on count 6 for failure to exhaust administrative remedies.

Bassick has responded that he either did exhaust his administrative remedies or was excused from doing so. Neither argument has merit. First, Bassick argues that he has exhausted his administrative remedies because he filed an initial administrative claim and, after he filed Count 6, Hay Group did not respond to that administrative claim. The court finds, however, that Bassick cannot be deemed to have exhausted his administrative remedies after he files suit. "As a pre-requisite to filing suit, an ERISA plaintiff must exhaust his internal administrative remedies." *Zhou v. Guardian Life Ins. Co. of America*, 295 F.3d 677, 679 (7th Cir. 2002). If an ERISA plaintiff could file an administrative claim and then "exhaust" his claim while his suit was pending, this requirement would be meaningless. In effect, the defendant would be required to evaluate a claim administratively at the same time that the defendant was defending itself in court. This runs counter to one of the purposes of exhaustion: to "encourage[] private resolution of internal employment disputes." *Stark v. PPM America, Inc.*, 354 F.3d 666, 671 (7th Cir. 2005). The court finds that Bassick has failed to exhaust his administrative remedies.

Next, Bassick argues that his failure to exhaust should be excused. The Seventh Circuit has recognized two circumstances when failure to exhaust can be excused: (1) when the plaintiff

---

[8]Bassick later amended his counterclaim to assert a claim for benefits under the "Bassick plan."

lacked "meaningful access to review procedures"; and (2) when it would have been futile for the plaintiff to pursue internal review. *Stark*, 354 F.3d at 671. Bassick claims that both exceptions apply.

Bassick's contention that he lacked meaningful access to review procedures fails. Bassick sent a letter to the Plan Administrator and received a timely response stating that an investigation was open. There is simply no indication that Bassick experienced any difficulty pursuing an administrative claim or that Hay would not have rendered an administrative decision had Bassick not filed a counterclaim under the SERP.

Whether Bassick's continued pursuit of administrative review would have been futile is a closer question. During this litigation, Hay has taken the position that Bassick is not entitled to SERP benefits. This seems to indicate that, if Bassick had properly pursued an administrative claim, it would surely have been denied. The Seventh Circuit, however, has stated that courts should not assume futility based on a defendant's current litigation position. *Stark*, 354 F.3d at 672 ("[W]hen a claimant ignores the administrative remedies and proceeds directly to federal court, he cannot be allowed to justify his choice by the fact that the plan defended itself in the lawsuit."). Other than this, Bassick has not presented evidence adequate to establish that Hay would not have proceeded in good faith if Bassick had brought an administrative claim and exhausted his administrative remedies.[9]

The court grants summary judgment in favor of Hay as to Count 6.

---

[9] In light of Bassick's failure to exhaust administrative remedies, the court finds it unnecessary to consider several ancillary issues raised by the parties, including what level of deference a decision of the plan administrator should be accorded and the effect of the 2000 SERP revisions on the amounts allegedly owed to Bassick.

**Tapling SERP claim**

When Hay revised and replaced the 1994 SERP with the 2000 SERP, it added a forfeiture

provision in section 2.6(b) reading:

> <u>Forfeiture for Cause</u>.  Notwithstanding anything herein contained to the contrary, a Participant shall not receive any payment of any then unpaid benefits hereunder and shall forfeit al rights under this Plan if any of the following events occur during Participant's employment or within one year of his Separation from Service.
>
> (i) the Participant has made any unauthorized disclosure to any person, firm or entity of confidential information . . .; or,
>
> (ii) the Participant has entered into the employ of or represented or acted in a consulting capacity to, or otherwise become directly or indirectly associated with (financially or otherwise) any person, firm or entity competing with any Participating Company's business or the business of any of its affiliates; or . . .
> (v) the Participant for any reason whatsoever
>       (A) solicits or otherwise directly or indirectly attempts to induce any employee of any Participating Company or its affiliates to terminate his employment; or
>
>       (B) solicits or does business directly or indirectly with any person or entity that was a client of any Participating Company or its affiliates on the date of his Separation from Service. . .

Under section 2.6(c), this forfeiture provision "shall not apply to any benefit amount accrued . . .

on or before December 31, 1999."  While there remain disputed issues of fact as to whether the

forfeiture provision applies to the Bassick SERP, there are no disputed issues of fact related to

Tapling, who participates in the regular Hay SERP.

Unlike counterclaimants' covenants not to compete, the forfeiture provision under the

SERP is valid.  *See Tatom v. Ameritech Corp.*, 305 F.3d 737, 744 (7th Cir. 2002) ("Federal cases

draw a distinction between provisions that prevent an employee from working for a competitor

and those that call for a forfeiture of certain benefits should he do so."); *Spitz v. Berlin Indus.,*

*Inc.*, No. 93 C 6355, 1994 WL 194051, at *3 (N.D. Ill. 1994) (finding that a forfeiture provision of a "top hat" pension plan was enforceable). Tapling's actions in working for a competitor (CSI) and servicing Hay clients triggers the forfeiture provision.

The parties argue about the enforceability of the forfeiture provision, given that the provision was added when the plan was amended in 2000, after Tapling had begun her employment. Section 4.8 of the 1994 Plan (which was in effect when Tapling started working at Hay) stated; "The Board shall have the power to amend or terminate the Plan in any way and at any time." The only limitation on this power was that the Board could not reduce amounts credited to participant accounts before the date of the amendment or termination. Therefore, when Tapling accepted employment with Hay, she knew that her benefits under SERP were not guaranteed to continue. Tapling received a copy of the 2000 amendment that added the forfeiture provision.

Tapling's only remaining argument is that the forfeiture provision was a modification to the Tapling Letter, and there was no consideration provided for that modification.[10] It is undisputed that Tapling was an at-will employee. "When an employment agreement is terminable at will, it may be modified by the employer as a condition of its continuance." *Geary v. Telular Corp.*, 793 N.E.2d 128, 131 (Ill. App. Ct. 2003) (citing cases). "When an at-will employee continues to work after a change in [his compensation] plan, he is deemed to have accepted the change." *Id.* (citing *Schoppert v. CCTC International, Inc.*, 972 F. Supp. 444, 447

---

[10] Bassick argues that the forfeiture provision is invalid because it applies retroactively to his SERP account. The court, however, declines to rule on the retroactivity argument because it does not apply to Tapling; it is undisputed that no contributions were made to Tapling's SERP account for the year 2000 until after the amendment became effective on July 1, 2000.

(N.D. Ill. 1997)).  Tapling continued to work for Hay until April 2002, almost two years after she received notification of the amendment.  Therefore, the amendment is enforceable as to Tapling.  Summary judgment in favor of Hay is granted with respect to amounts which accrued to Tapling in the Hay SERP plan after the amendment became effective in July 2000.

### Count VII - ERISA under Bassick Letter Section 4.D.

In count VII, Bassick asserts that section 4.D. of the Bassick Letter constitutes another ERISA-regulated plan in which he is a participant (in addition to the 1994 SERP and the alleged Bassick SERP).  Hay has moved for summary judgment on Count VII, arguing that section 4.D. is not an ERISA plan.  The court agrees.  The motion for summary judgment in favor of Hay is granted.[11]

It is undisputed that section 4.D. provides for a one time lump sum payment to Bassick upon his termination with Hay.  No other employees are covered by section 4.D.; it is unique to Bassick.  Hay has no discretion under section 4.D. to decide when to pay Bassick or the amount of the payment.  Instead, the amount is calculated by "an objective arithmetic formula."

This court previously denied Hay's motion to dismiss this count because it was not clear from the pleadings that section 4.D. required a single lump sum payment.  Where a benefit is payable in a lump sum and requires no discretion on the part of the employer to calculate, the benefit does not qualify as an ERISA plan.  *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987) (one-time severance payment arrangement with no ongoing administrative aspects does not qualify as an ERISA-regulated plan); *but see Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323

---

[11]  The court notes that Bassick's claims for compensation under Section 4.D. are still viable under Count I for breach of contract.

(9th Cir. 1992) (lump-sum severance payment scheme an ERISA plan where it involved particularized discretionary analysis). Now, at the summary judgment stage, Bassick has admitted that section 4.D. required a one-time lump sum payment.

Bassick attempts to argue that section 4.D. requires ongoing administration because Hay's accounting department calculated and accrued Hay's liabilities each year. Following appropriate accounting principles is not sufficient to convert a future lump sum payment into an ERISA plan. If this were so, then every future lump sum payment negotiated with an employee would become an ERISA plan simply by virtue of the employer's efforts to keep accurate accounting records. Summary judgment in favor of Hay as to Count VII is granted.

## Conclusion

For the reasons discussed herein, defendants' motion for summary judgment is granted as to counts II, III, IV, and V of the first amended complaint, and denied as to counts I, VI, VII and VIII. Counterdefendants' motion for partial summary judgment is granted as to Bassick's and Tapling's bonus counterclaims; counts 6 and 7 of the counterclaims (in their entirety); and as to amounts accrued for Tapling in the Hay SERP plan after the amendment became effective in July 2000. Hay's motion for partial summary judgment is denied as to Hay's car and investment allowance obligations to Bassick; Bassick's and Tapling's severance and Health benefits claims; and Bassick's breach of contract claims with respect to section 4.D. of the Bassick Letter.

ENTER:

_____/s/_____
Joan B. Gottschall
United States District Judge

Dated: September 29, 2005